UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KARL HALL and MARLENE HALL,  )
                              )
        Plaintiffs,           )
                              )
    v.                        )        2:16-cv-00417-JAW
                              )
DELTA AIR LINES, INC. and     )
FLIGHT SERVICES & SYSTEMS,    )
INC.                          )
                              )
        Defendants.           )

## ORDER MOTION FOR SUMMARY JUDGMENT

Karl Hall and Marlene Hall bring this diversity action against an airline and one of its contractors alleging common law negligence and statutory loss of consortium and seeking punitive damages arising out of two incidents of personal injury. The airline moves for summary judgment on all counts, arguing preemption, a lack of vicarious liability, and the inapplicability of punitive damages. The Court denies the Motion for Summary Judgment (ECF No. 42).

## I.    PROCEDURAL HISTORY

On August 16, 2016, Karl Hall and his wife Marlene Hall filed a complaint in this Court against Delta Air Lines, Inc. (Delta) and Flight Services & Systems, Inc. (FSS). *Compl.* (ECF No. 1). The Complaint contains four counts: Count I— common law negligence arising out of a 2015 incident, in which Mr. Hall was injured disembarking a Delta flight in Maine (the 2015 incident); Count II—loss of consortium, pursuant to 14 M.R.S. § 302, arising out of the 2015 incident; Count III—

common law negligence arising out of a 2016 incident, in which Mr. Hall was injured boarding a Delta flight in Georgia (the 2016 incident); Count IV— loss of consortium, pursuant to 14 M.R.S. § 302, arising out of the 2016 incident.  *Id.* at 3-5.  On September 13, 2016, Delta answered the Complaint.  *Answer and Demand for Jury Trial* (ECF No. 6).[1]

On June 6, 2017, Delta filed a motion for summary judgment, *Delta's Mot. for Summ. J.* (ECF No. 42) (*Def.'s Mot.*), with a statement of material facts, *Statement of Material Facts as to Which Delta Air Lines, Inc. Contends There is no Genuine Issue of Material Fact to be Tried* (ECF No. 43) (DSMF), as well as the stipulated record. *Stipulation as to Facts Admitted Solely for Purposes of Summ. J.* (ECF No. 40) (*Stip.*). On June 23, 2017, the Halls filed their opposition, *Pls.' Opp'n to Delta Air Lines, Inc.'s Mot. for Summ. J.* (ECF No. 48) (*Pls.' Opp'n*), their response to Delta's statement of material facts, *Pls.' Opposing Statement of Material Facts* (ECF No. 49) (PRDSMF), and a set of additional material facts.  *Id.* at 15-21 (PSAMF).  On July 7, 2017, Delta replied to the Halls' opposition, *Delta's Reply Mem. in Supp. of Mot. for Summ. J.* (ECF No. 51) (*Def.'s Reply*), and to the Halls' additional material facts.  *Delta's Reply Statement of Material Facts* (ECF No. 52) (DRPSAMF).

## II.    STATEMENT OF FACTS

[1]    On September 22, 2016, the Halls moved for entry of default against FSS because it failed to file a timely answer, *Mot. for Entry of Default Pursuant to Federal Rule of Civil Procedure 55(a)* (ECF No. 8), which the Court granted on September 23, 2016.  *Order* (ECF No. 9).  FSS moved to set aside the default judgment and filed its answer on November 18, 2016.  *Assented-To Mot. to Lift Default of Def. Flight Services & Systems, Inc. ("FSS") and Accept FSS's Answer for Filing* (ECF No. 13); *Answer and Affirmative Defenses* (ECF No. 14).  On November 21, 2016, the Court granted the motion to set aside the default against FSS.  *Order* (ECF No. 16).  FSS is not involved in the pending motion for summary judgment.

## A. The Parties

As of the dates of both incidents, Karl Hall was a qualified individual under the Air Carrier Access Act (ACAA), 49 U.S.C. § 41705 *et seq.* and a passenger with a disability under 14 C.F.R. Part 382.  *Stip.* ¶ 7; PRDSMF ¶ 7.  He suffers from muscular dystrophy.  DSMF ¶ 9; PRDSMF ¶ 9.  As a result of this condition, Mr. Hall has little to no motor control over his own body and cannot prevent himself from falling if not properly secured in a chair.  PSAMF ¶ 71.  Delta is a common carrier subject to the laws, rules, and regulations of the United States relating to the airline industry.  *Stip.* ¶ 8; PRDSMF ¶ 10.

## B. Delta's Mobility Contractors: FSS and AirServ

### 1. FSS Services at Portland International Jetport

Pursuant to a contract dated January 19, 2009, Delta contracted with FSS to perform passenger assistance services for Delta's passengers at the Portland International Jetport in Portland, Maine, including the transfer of passengers to and from wheelchairs to aircraft seats with the aid of aisle chairs and assistance to passengers in boarding and deplaning.  *Stip.* ¶ 1; *id.* Attach. 1 *Airport Services Master Agreement* (*FSS Contract*); PRDSMF ¶ 1.  Section 2.5 of the FSS contract states:

> All Services shall be furnished by Contractor as an independent contractor.  All personnel utilized by Contractor in the furnishing of such Services shall be employees of Contractor and under no circumstances shall be deemed employees of Delta. Contractor shall be fully responsible for all acts and omissions of such personnel.[2]

---

[2]     The rest of the provision reads:
Contractor shall bear sole responsibility for payment of compensation to its personnel. Contractor shall withhold (if applicable), pay and report, for all personnel assigned to the Services, federal, state and local income tax withholding, social security taxes, employment head taxes, and unemployment insurance applicable to such personnel as

DSMF ¶ 23; *FSS Contract* at 4[3]; PRDSMF ¶ 23.

The contract also provides that FSS is obligated "to comply with all applicable laws, rules, regulations and procedures, including without limitation the Air Carrier Access Act (ACAA) of 1986 and 14 C.F.R. Part 382" in its provision of passenger assistance services. DSMF ¶ 27; *FSS Contract* at 45; PRDSMF ¶ 27. The contract further states that FSS "shall ensure supervisory personnel are familiar with all aspects of the operation relating to special services, including providing training related to 14 CFR Part 382, and that such personnel "shall be responsible for operations oversight [and] employee conduct and performance . . ." DSMF ¶¶ 28, 29; *FSS Contract* at 47; PRDSMF ¶ 29. FSS also is obligated to "[t]ransfer . . . customers to/from the wheelchair and aircraft seat with the aid of an aisle chair and [provide] assistance in boarding, deplaning and transfers of customers between gates." DSMF ¶ 30; *FSS Contract* at 47; PRDSMF ¶ 30. The contract requires that "[p]rior to interacting with the traveling public, contractor personnel are required to complete training regarding the requirements of Part 382 and Delta's disability procedures, including the proper and safe operation of any equipment used to accommodate

---

employees of Contractor. Contractor shall bear sole responsibility for any health or disability benefits, retirement benefits, or welfare, pension or other benefits (if any) to which such personnel may be entitled. Contractor agrees to defend, indemnify, and hold harmless Delta, Delta's officers, directors, employees and agents, any benefit plan sponsored by Delta, and any fiduciaries or administrators of any such benefit plan, from and against any claims, liabilities, or expenses relating to any claim by Contractor's personnel for compensation, tax, insurance, or benefits from Delta or any benefit plan sponsored by Delta.

DSMF ¶ 23; *FSS Contract* at 4; PRDSMF ¶ 23.

[3]     The Court uses the pagination of the PDF file.

individuals with a disability."[4]  DSMF ¶ 32; *FSS Contract* at 48-49; PRDSMF ¶ 32.

The contract also mandates that FSS "institute and maintain an effective quality

assurance program to ensure Passenger Assistance Services comply with 14 C.F.R.

Part 382."  DSMF ¶ 33; *FSS Contract* at 50; PRDSMF ¶ 33.[5]

After reviewing FSS's training curriculum, Delta's General Manager of Airport

Customer Service Learning, by memorandum dated March 12, 2014, advised FSS

that:

> This letter acknowledges that your request to accept **Wheelchair
> Assistance Training** provided by **FSS** Service Learning.
>
> It is acknowledged that **FSS** has agreed to keep their training records
> updated and available for inspection at any time. It is also acknowledged
> that **FSS** guarantees that they will only provide qualified personnel for
> Delta's operation.

*Stip.* ¶ 11; *id.* Attach. 3 *Memo* (emphasis in original); PRDSMF ¶ 34.

Delta was contractually empowered to review and approve all FSS staffing

plans related to the provision of the Services to disabled passengers, such as Mr. Hall;

FSS did in fact provide staffing plans for Portland-based services to Delta for review

and, if Delta found them deficient, Delta was authorized to order FSS to change them.

---

[4]      The remainder of the provision reads:
         The training shall ensure that each employee is trained to proficiency as appropriate
         to their duties and responsibilities for the handling of disabled passengers.  Contractor
         shall ensure that each employee providing Passenger Assistance Services will
         understand the specific requirements of 14 C.F.R. Part 382 that apply to his/her job
         responsibilities, and shall meet the following objectives:
         (i)      Full compliance with all pertinent requirements under 14 C.F.R Part 382.
         (ii)     Adherence to applicable Delta policies and procedures relating to the handling
         of disabled passengers.
         (iii)    Emphasis on wheelchair transportation safety training
DSMF ¶ 32; *FSS Contract* at 48-49; PRDSMF ¶ 32.
[5]      The Halls accurately point out that Delta omitted "and maintain" from its restatement of this
section of the contract.  PRDSMF ¶ 33.  The Court corrects this omission.

PSAMF ¶ 54.[6] Delta was contractually empowered to instruct FSS on how to provide Services to, inter alia, disabled passengers such as Mr. Hall, at the Portland airport. PSAMF ¶ 55.[7] Pursuant to the terms of the FSS Contract, Delta reviews and approves the content and nature of passenger Services-related training provided to FSS employees, including training on how to properly enplane and deplane disabled passengers such as Mr. Hall. PSAMF ¶ 56.[8]

## 2. AirServ Services at Hartsfield-Jackson Atlanta International Airport

Pursuant to a contract dated April 9, 2009, Delta contracted with AirServ to perform passenger assistance services for Delta's passengers at the Hartsfield-Jackson Atlanta International Airport in Atlanta, Georgia, including the transfer of passengers to and from wheelchairs to aircraft seats with the aid of aisle chairs and assistance to passengers in boarding and deplaning. *Stip.* ¶ 4; *id.* Attach. 2 *Airport Services Master Agreement* (*AirServ Contract*); PRDSMF ¶ 4. Section 2.5 of the contract between Delta and AirServ states:

> All Services shall be furnished by Contractor as an independent contractor. All personnel utilized by Contractor in the furnishing of such Services shall be employees of Contractor and under no circumstances

---

[6] Delta acknowledges the correctness of this statement but qualifies it by quoting this line from the FSS Contract: "At local station management request, Contractor will provide staffing plans for review and approval by Delta." DRPSMF ¶ 54. Delta points to a portion of the deposition of Katherine Hughes, the station manager for Delta at Portland, in which she acknowledges that she can require FSS to remedy any inadequacies she identifies in staffing plans. *Id.* (citing *Hughes Dep.* at 13:3-10). The qualification does not clarify any relevant issues, so the Court omits it.

[7] The Halls support the statement with a citation to a portion of Section 2.6 of the FSS Contract. Delta qualifies this statement by simply quoting the entirety of Section 2.6 without explaining the purpose of the qualification. The Court rejects Delta's qualification.

[8] The Halls cite Paragraph 11 of the Stipulation, among other sources, for this statement. In its qualification, Delta quotes the text of Paragraph 11, without explaining its rationale for quoting the entire text. The Court rejects Delta's qualification.

shall be deemed employees of Delta. Contractor shall be fully responsible for all acts and omissions of such personnel.[9]

DSMF ¶ 36; *AirServ Contract* at 4[10].

The contract also provides that AirServ is obligated "to comply with all applicable laws, rules, regulations and procedures, including without limitation the Air Carrier Access Act (ACAA) of 1986 and 14 C.F.R. Part 382" in its provision of passenger assistance services. DSMF ¶ 40; *AirServ Contract* at 50; PRDSMF ¶ 40. The contract also provides that AirServ "shall ensure supervisory personnel are familiar with all aspects of the operation relating to special services, including providing training related to 14 CFR Part 382, and that such personnel "shall be responsible for operations oversight [and] employee conduct and performance . . ." DSMF ¶ 42; *AirServ Contract* at 50; PRDSMF ¶ 42. AirServ is required to "[t]ransfer . . . customers to/from the wheelchair and aircraft seat with the aid of an aisle chair and provision of assistance in boarding, deplaning and transfers of customers between gates." DSMF ¶ 43; *AirServ Contract* at 50; PRDSMF ¶ 43. The contract requires:

---

[9]     The provision continues:
        Contractor shall bear sole responsibility for payment of compensation to its personnel. Contractor shall withhold (if applicable), pay and report, for all personnel assigned to the Services, federal, state and local income tax withholding, social security taxes, employment head taxes, and unemployment insurance applicable to such personnel as employees of Contractor. Contractor shall bear sole responsibility for any health or disability benefits, retirement benefits, or welfare, pension or other benefits (if any) to which such personnel may be entitled. Contractor agrees to defend, indemnify, and hold harmless Delta, Delta's officers, directors, employees and agents, any benefit plan sponsored by Delta, and any fiduciaries or administrators of any such benefit plan, from and against any claims, liabilities, or expenses relating to any claim by Contractor's personnel for compensation, tax, insurance, or benefits from Delta or any benefit plan sponsored by Delta.
DSMF ¶ 36; *AirServ Contract* at 4.
[10]    The Court uses the pagination of the PDF file.

Prior to interacting with the traveling public, contractor personnel are required to complete training regarding the requirements of Part 382 and Delta's disability procedures, including the proper and safe operation of any equipment used to accommodate individuals with a disability.[11]

DSMF ¶ 45; *AirServ Contract* at 51-52; PRDSMF ¶ 45. The contract also requires that AirServ "institute and maintain an effective quality assurance program to ensure Passenger Assistance Services comply with 14 C.F.R. Part 382." DSMF ¶ 46; *AirServ Contract* at 53; PRDSMF ¶ 46.[12]

After reviewing AirServ's training curriculum, Delta's General Manager of Airport Customer Service Learning, by memorandum dated February 25, 2016, advised AirServ that:

This letter acknowledges that your request to accept **Wheelchair Assistance Training** provided by **AIRSERV** in **ATL**, in lieu of training provided by Delta has been accepted Airport Customer Service Learning.

It is acknowledged that **AIRSERV** has agreed to keep their training record updated and available for inspection at any time. It is also acknowledged that **AIRSERV** guarantees that they will only provide qualified personnel for Delta's operation.

*Stip.* ¶ 12; *id.* Attach. 4 *Memo* (emphasis in original); PRDSMF ¶ 47.

---

[11] The remainder of the provision reads:
The training shall ensure that each employee is trained to proficiency as appropriate to their duties and responsibilities for the handling of disabled passengers. Contractor shall ensure that each employee providing Passenger Assistance Services will understand the specific requirements of 14 C.F.R. Part 382 that apply to his/her job responsibilities, and shall meet the following objectives:
(i)     Full compliance with all pertinent requirements under 14 C.F.R Part 382.
(ii)    Adherence to applicable Delta policies and procedures relating to the handling of disabled passengers.
(iii)   Emphasis on wheelchair transportation safety training
DSMF ¶ 45; *AirServ Contract* at 51-52; PRDSMF ¶ 45.
[12]     The Halls accurately point out that Delta omitted "and maintain" from its restatement of this section of the contract. PRDSMF ¶ 46. The Court corrects the statement accordingly.

Delta was contractually empowered to review and approve all AirServ staffing plans related to provision of the Services to disabled passengers, such as Mr. Hall. PSAMF ¶ 51.[13] AirServ did in fact provide staffing plans for Atlanta-based services to Delta for review. *Id.* Delta was contractually authorized to provide instructions to AirServ on how to provide services to disabled passengers, such as Mr. Hall, at the Atlanta airport. PSAMF ¶ 52.[14] Pursuant to the terms of the AirServ contract, Delta reviews and approves the content and nature of passenger services-related training provided to AirServ employees, including training on how to properly enplane and deplane disabled passengers such as Mr. Hall. PSAMF ¶ 53.[15]

### C. Flight Operations, Roles, and Responsibilities of Delta, FSS, and AirServ

Once the pilot is on the plane, the pilot has control over everything that happens on the plane. PSAMF ¶ 57; DRPSAMF ¶ 57.[16] AirServ and FSS employees

---

[13]   Delta acknowledges the correctness of this statement but qualifies it by quoting this line from the AirServ Contract: "At local station management request, Contractor will provide staffing plans for review and approval by Delta." DRPSAMF ¶ 51. The Court does not understand how the qualification clarifies any relevant issues, so it omits it.

[14]   The Halls support the statement with a citation to a portion of Section 2.6 of the AirServ Contract. Delta qualifies this statement by simply quoting the entirety of Section 2.6 without explaining the purpose of the qualification. DRPSAMF ¶52. The Court rejects it.

[15]   The Halls cite Paragraph 12 of the Stipulation, among other sources, for this statement. In its qualification, Delta quotes the text of Paragraph 12. The rationale behind the qualification is not apparent. The Court rejects the qualification.

[16]   In support of this statement, the Halls cite 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft"), and the deposition of Benjamin Crown, Delta's Manager of Airport Operations Above Wing Policy and Procedure. *Crown Dep.* at 26:17-21; 35:1-5, 76:5-78:11.

Delta qualified that statement, also citing the deposition of Benjamin Crown. DRPSAMF ¶ 57. Delta argues that Mr. Crown agreed that "as a general matter" once the pilot is on the plane he is in control of things that happen on the plane, *Crown Dep.* at 26:17-21, but that he also said that "[o]ne of the things that would not be covered by the flight crew would be passenger handling specific to this case." *Id.* at 26:3-12. Delta claims that he also said that if there was a dispute between the mobility contractor and the cabin crew, the cabin crew would not have authority over the mobility contractor. *Id.* at 78:17-21.

enplaning or deplaning passengers cannot board Delta planes until the Delta flight crew is already on board and the flight crew notifies the gate that they are ready for boarding. PSAMF ¶ 58; DRPSAMF ¶ 58. The Federal Aviation Administration (FAA) requires that the flight crew be on board before mobility contractors such as AirServ or FSS come aboard so that the crew can supervise the loading and unloading of passengers and ensure their safety. PSAMF ¶ 59; DRPSAMF ¶ 59.[17] Delta's flight attendant training materials state that "[a]s flight attendants we have the responsibility to assist our passengers during boarding, in flight and upon deplaning"

<hr />

Although the issue is a close one, the Court declines to accept Delta's qualification. The FAA regulation the Halls cite speaks to the operation of the aircraft, which is narrower than "everything that happens on the plane." Mr. Crown agrees with the proposition that "once the pilot is on the plane, as a general matter he's in control of things that happen on the plane," *id.* at 26:17-21, and that generally "once the plane is connected to the jet-way and once the flight crew is on the plane, things that happen on the plane . . . are under the control of the flight crew." *Id.* 26:3-10. However, he states that "[o]ne of the things that would not be covered by the flight crew would be passenger handling specific to this case." *Id.* at 26: 10-12. With respect to a dispute between a mobility contractor and the cabin crew, Mr. Crown denied that the cabin crew would have authority over the mobility contractors. He asserted that "in that instance, the cabin crew and/or flight crew should be calling a CRO from the airport to come and handle that dispute." *Crown Dep.* at 78:17-79:1. However during a time-sensitive event, such as someone being dropped on the floor, he stated that it would be the obligation of the pilot, co-pilot, cabin crew, or any other Delta employee to take control and ensure the safety of the passenger. *Id.* at 79:2-12. Whether the pilot, the crew or the mobility contractor would have had authority over the incidents in this case is a factual issue and, under the summary judgment rubric, the Court must view factual disputes in the light most favorable to the non-movant.

[17] The Halls' original additional statement of fact read: "The Federal Aviation Administration requires that the flight crew be on board before mobility contractors such as AirServ or FSS come aboard to ensure that passengers are safely boarded or embarked; this is so the cabin crew can supervise everything going on in the cabin." In support, the Halls cite 14 C.F.R. 121.394 as well as portions of Mr. Crown's deposition and the deposition of Kristean Jacobs, General Manager for FSS at the Portland airport.

Delta qualified the statement stating that the regulation's requirement with respect to flight attendant presence onboard an aircraft during passenger boarding and deplaning is for safety purposes and to make sure that proper egress can be maintained—not so that they can supervise everything that is going on. Delta cites Mr. Crown's deposition.

Ms. Jacobs agrees with the statement that the regulation's purpose is "so that the crew supervise what's going on in the cabin." *Jacobs Dep.* at 30:13-31:10. Mr. Crown opines that the regulation is in place "in order that proper egress can be obtained if needed. It's for safety purposes." *Crown Dep.* at 36:7-11. He agrees with the proposition that "part of that is to supervise the loading of passengers." *Id.* at 36:12-14. The Court accepts the qualification and adjusts the statement accordingly.

and that the flight attendants' responsibilities include "[h]elp[ing] get the customer on and off the aircraft." PSAMF ¶ 60; DRPSAMF ¶ 60.

Delta flight attendants are required, as part of their job responsibilities, to ensure that disabled partners are enplaned and deplaned safely. PSAMF ¶ 61.[18] In general, if Delta flight attendants see any unsafe enplaning or deplaning procedures, including with disabled passengers under the supervision of mobility contractors, they are expected to intervene. PSAMF ¶ 62; DRPSAMF ¶ 62.[19] Mobility contractors, such as AirServ or FSS, have no right to refuse to honor these Delta instructions regarding special needs for deplaning that are identified midflight, such as a request for a wheelchair or the request the Delta pilot made for two male mobility agents to meet the Halls' plane in Portland to assist Mr. Hall in deplaning. PSAMF ¶ 66; DRPSAMF ¶ 66.[20] Katherine Hughes, the station manager for Delta at Portland, has never seen a Delta flight attendant actively assist a customer in transition because it

---

[18] Delta seeks to qualify this statement with reference to the requirements of FAA regulations. DRPSAMF ¶ 61. Benjamin Crown's statements in his deposition support the Halls' additional statement of fact. *Crown Dep.* at 36:15-37:8. The Court reject's Delta's qualification.

[19] The Halls' original additional statement of fact omitted the words "in general." The Court added them to address Delta's qualification that Mr. Crown did not know what the flight attendants' procedures are for responding to a non-normal occurrence during boarding. *Crown Dep.* at 37:9-17. However, he would expect that if someone was dropped on the floor, he would expect the cabin crew to step in. *Crown Dep.* at 79:2-12; DRPSAMF ¶ 62.

[20] Citing Mr. Crown's deposition, the Halls' original additional statement of fact read: "Mobility contractors, such as AirServ or FSS, have no ability to refuse to honor these Delta instructions regarding deplaning or enplaning, such as the request where two male mobility agents were asked by the Delta pilot to meet the Halls' plane in Portland and assist Karl Hall in deplaning."

Delta qualifies this stating that "Mr. Crown was testifying about the flight crew informing the captain when additional requests are made by persons with disabilities such as wanting a wheelchair upon arrival or, as in this case, wanting two male employees of the mobility contractor available to assist upon arrival in Portland, and he was explaining that the mobility contractor could not respond to the captain that it was not going to honor the passenger's request." DRPSAMF ¶ 66.

The Court accepts the qualification because the scope of Mr. Crown's testimony on this issue is limited to deplaning and requests that come to the mobility contractor from a flight this is in progress. *Crown Dep.* at 72:22-74:17.

has always been in the contract with FSS for FSS to move the passengers as that is what Delta and the other participating airlines in the wheelchair consortium hired FSS to do.  DSMF ¶ 19.[21]

At each airport, Delta has complaint resolution officials ("CROs"), who are Delta employees specially trained to handle any types of issues or incidents involving passengers with disabilities.  PSAMF ¶ 63; DRPSAMF ¶ 63.  As part of their responsibilities, CROs interact with air mobility contractors such as AirServ and, if necessary, will step in to address any problems with Part 382 services provided by mobility contractors; Delta CROs have the ability to resolve any disability-related issues, including any dispute between Delta employees and mobility contractors related to disabled passengers.  PSAMF ¶ 64; DRPSAMF ¶ 64.

FSS employees are trained that "[m]ost passengers react to a uniform and don't really distinguish between FSS employees and the employees of our contracted airlines."  PSAMF ¶ 69.[22]  In the experience of Kristean Jacobs, FSS' General

___

[21]    The Halls qualify this statement citing portions of the deposition of Ms. Hughes, wherein she agrees that Delta flight attendants have responsibility for the welfare of passengers the entire time the passengers are on the plane "includ[ing] when they are being enplaned or deplaned by FS[S]."  PRDSMF ¶ 19 (citing *Hughes Dep.* at 33:12-18).  They also cite her indication that she would expect the flight attendants to step in or at least raise an alarm if they noticed something that was being done improperly.  *Id.* at 33:19-25.  The portions cited by the Halls do not undermine Delta's statement, they make separate points and stand alone.  The Court rejects the qualification.

[22]    The Halls quote this language directly from FSS training materials.  They cite a portion of the deposition of Kristean Jacobs, FSS' General Manager at the Portland airport, that corroborates the notion asserted in the training materials.

Delta qualifies this statement, writing, "[t]he FSS Power Point slide states this, but it is in the context of discussing difficult passengers and avoiding verbal altercations with passengers."  DRPSAMF ¶ 69.  The Court rejects the qualification because the context does not detract from the veracity of the statement, and the statement is not misleading.  On a presentation slide entitled " Purpose of Mobility Assistant (cont.)," the predominant theme is one of passenger satisfaction.  PRDSMF Attach. 5 *Exhibit E – Purpose of Mobility Assistant (cont.)*.  While the slide mentions difficult passengers and avoiding verbal altercations, it also speaks of exchanging pleasantries with passengers, a method for passengers to report satisfaction to FSS, and compliance with Part 382 regulation.  *Id.*

Manager at the Portland airport, when passengers are flying on a specific airline, they generally believe all the personnel they interact with are employees of that airline, even if some may be employed by others, such as FSS. PSAMF ¶ 70; DRPSAMF ¶ 70.[23]

### D. The 2015 Incident

The 2015 incident occurred while Mr. Hall was disembarking a Delta aircraft at the Portland airport. DSMF ¶ 13; PRDSMF ¶ 13. Employees of FSS boarded Delta's aircraft and moved Mr. Hall from his seat into an aisle chair. *Stip.* ¶ 2; PRDSMF ¶ 13. After Mr. Hall was seated in the aisle chair, the FSS personnel secured only one strap across Mr. Hall. DSMF ¶ 14; PRDSMF ¶ 14. While the FSS personnel focused on trying to keep Mr. Hall's feet on the platform, Mr. Hall fell over to the side and hit his head on the armrest. DSMF ¶ 14; PRDSMF ¶ 14. There is no evidence that any Delta employee directly contributed to this incident of personal injury. DSMF ¶ 48.[24]

---

[23] The Halls' original statement read: "In FSS's experience, when passengers are flying on a specific airline, they generally believe all the personnel they interact with are employees of that airline, even if some may be employed by others, such as FSS." PSAMF ¶ 70. In doing so, it cited Ms. Jacobs' testimony.
Delta qualified that Ms. Jacobs' statement was with regard to her personal experience. DRPSAMF ¶ 70. The Court accepts the qualification and modifies the statement accordingly.

[24] The Halls object to this statement as a legal conclusion and argue that it should be stricken. They write "To the extent that [DSMF] ¶ 48 is asserting that no actual Delta employees, i.e., personnel actually employed and paid for by Delta, were directly involved in the negligent accidents that resulted in injury to Karl Hall, and without any waiver of the Plaintiffs' arguments that Delta, inter alia, exercised sufficient control over the FSS and Air Serv such that Delta is liable for their negligence, Plaintiffs admit the allegations contained therein. To the extent that [DSMF] ¶ 48 implies that this narrow fact somehow precludes a finding of legal liability against Delta for the negligence of FSS and Air Serv, Plaintiffs deny the allegations contained therein." PRDSMF ¶ 48.
The Court interprets Delta's statement to simply mean—as a matter of fact only—that it was FSS employees, as opposed to Delta employees, who physically transferred Mr. Hall to the aisle chair and were directly attending to him when he fell and was injured. The Court rejects the Halls' qualification as an argument of law, not a dispute of fact.

During the incident, the FSS employees were providing the services that FSS was obligated to provide under its contract with Delta. *Id.*; PRDSMF ¶ 2. The FSS employees wore FSS clothing that identified them as such. *Id.* ¶ 3; PRDSMF ¶ 3. At the time of the 2015 incident, Mr. Hall thought that the two FSS employees who were helping him deplane were Delta employees, but at a later time he learned they were not. DSMF ¶ 12; PRDSMF ¶ 12. The Delta flight crew members, consisting of the pilot, first officer, and flight attendants, on board the aircraft were employees of Delta. *Stip.* ¶ 9; PRDSMF ¶ 11.

### E. Communications between the Parties after the 2015 Incident

Delta found that the incident constituted a violation of 14 C.F.R. § 382. PSAMF ¶ 49.[25] The September 25, 2015 e-mail from Contact Delta to Mr. Hall never suggests that any third party may be liable for the Part 382 violation. PSAMF ¶ 68.[26]

### F. The 2016 Incident

---

[25]     The Halls cite a September 25, 2015 e-mail from Delta and a portion of Katherine Hughes' deposition in support of this statement. Delta seeks to qualify it. Delta quotes the e-mail: "As a result of your comments and the information in our reports, we have determined that a violation of 14CFR [sic], Part 382 did occur on flight 1132." DRPSAMF ¶ 49. The Court is uncertain why Delta qualified its response, and Delta does not explain why. If it did so in order to imply that the September 25, 2015 e-mail might not have been referring to the 2015 incident involving Mr. Hall, the Court rejects the qualification.

 Its e-mail is a response to a complaint Micah Hall submitted on his father's behalf, in which he described the 2015 incident. In the context of the full e-mail exchange, the only violation of 14 C.F.R. Part 382 to which Delta could have been referring in its reply e-mail was the 2015 incident, not some other violation that occurred on Flight 1132. Katherine Hughes confirms this interpretation in her response to a question about the e-mail:

 Q: You saw that they've determined -- that Delta determined it was a violation of Part 382?
 A: Yes.

If the purpose of the qualification is to emphasize that Delta's admission of a violation was based on the information Delta had at the time, this goes without saying. The Court sees no valid basis for Delta's quibbling and rejects the qualification.

[26]     Delta qualifies this additional statement, stating, "This is true, but in the same paragraph it states that Mr. Hall's concerns are being directed to Delta's Vendor Service leadership team." DRPSAMF ¶ 68. The qualification does not undermine the veracity of the statement, so the Court rejects the qualification.

The 2016 incident occurred during the boarding process at the Atlanta airport. DSMF ¶ 15; PRDSMF ¶ 15. There, AirServ employees placed Mr. Hall into an aisle chair, wheeled him onto the aircraft, attempted to lift him out of the aisle chair, over the armrest of the airplane seat, and into his aircraft seat. *Stip.* ¶ 5; DSMF ¶ 15; PRDSMF ¶ 15. During this process, the employees dropped Mr. Hall onto the floor. *Stip.* ¶ 5. The larger of the two AirServ employees got behind Mr. Hall, putting her hands under his arms while the smaller of the two employees grabbed his feet, and as they were trying to transfer him over the armrest, all of a sudden Mr. Hall ended up on the floor. DSMF ¶ 16; PRDSMF ¶ 16. There is no evidence that any Delta employee directly contributed to this incident of personal injury. DSMF ¶ 48.[27] After Mr. Hall was dropped during the 2016 Incident, the Delta flight crew immediately intervened to assist him; the pilot and first officer picked up Mr. Hall and placed him into his seat. PSAMF ¶ 65; DRPSAMF ¶ 65.

In providing these services, the AirServ employees were providing services that AirServ was obligated to provide under its contract with Delta. *Stip.* ¶ 5; PRDSMF ¶ 5. These AirServ employees wore AirServ clothing that identified them as such. *Stip.* ¶ 6; PRDSMF ¶ 6. The Delta flight crew members, consisting of the pilot, first officer and flight attendants, on board the aircraft were employees of Delta. *Stip.* ¶ 9; PRDSMF ¶ 11.

---

[27] The Halls object to this statement just as they did to the same statement as applied to the 2015 incident and for the same reasons. *See supra* note 5. For the same reasons set forth above, the Court rejects the Halls' objection.

After this incident, at the request of Mrs. Hall that strong men be available to assist her husband deplane, while en route from Atlanta to Portland, the Delta pilot radioed ahead to the Portland airport and requested that FSS have two male attendants assist Mr. Hall with deplaning. *Stip.* ¶ 10; PRDSMF ¶ 20.

## G. Communications between the Parties after the 2016 Incident

Mr. Hall did not understand who was involved in the June 8, 2016 incident, but three days after the incident, he wrote to FSS stating that he was still trying to resolve the 2015 incident and he asked FSS to advise him of its plans to bring closure to both the 2015 Portland incident and the 2016 Atlanta incident. DSMF ¶ 18; PRDSMP ¶ 18. Delta found that the 2016 incident constituted a violation of 14 C.F.R. § 382. PSAMF ¶ 50.[28] On June 21, 2016, Mr. Hall received an e-mail from Delta stating, in part:

> Thanks for taking the time to let me know of your poor experience when being boarded on Flight 2574 on June 5 from ATL to PWM. Your son also contacted us via Social Media about this situation and let us know you went to the hospital. I hope everything checked out well and that you are feeling much better now. I can certainly understand how upset you – as well as your family – must be, especially since a similar situation occurred last year. You have every right to expect better from us and I'm so very sorry we let you down.

---

[28]    In support of this statement, the Halls point to a June 21, 2016 email from Delta to Karl Hall, PRDSMF Attach. 2 *Exhibit B*, at 1-2 (*2016 E-mail*), and to the deposition of Benjamin Crown. PRDSMF Attach. 3 *Dep. Of Benjamin Crown*, at 51:14-52:16 (*Crown Dep.*). Delta qualifies the statement pointing out that the e-mail states, "As a result our records show a violation of 14CFR, Part 382 occurred." DRPSAMF ¶ 50. Delta states that "Benjamin Crown testified at the Rule 30(b)(6) deposition that he found the comment a little surprising." *Id.*

Delta quotes from the e-mail correctly. However, the vast majority of the ten sentences immediately preceding the sentence Delta quotes describe the details of the 2016 incident. Hence, the only violation of 14 C.F.R. Part 382 to which Delta could have been referring in its reply e-mail was the 2016 incident, not some other violation. Benjamin Crown confirms this interpretation of the e-mail in his deposition in response to questions about the e-mail, even though he also states that he found that part of the e-mail surprising. *Crown Dep.* At 52:6-14. The Court rejects Delta's qualification.

I've reviewed your concerns that you were dropped by the two attendants when they tried to assist you into the airplane seat. While these attendants don't work for Delta, they do represent us so when we receive a complaint like yours, we want to understand what went wrong . . .

I am so very sorry you were not properly helped into the seat [i]n Atlanta and for the embarrassment this caused. As a result, our records show a violation of 14 CFR, Part 382 occurred. This incident is being thoroughly reviewed with all involved and with the leadership team in ATL to make every effort that nothing like this occurs again.

PSAMF ¶ 67; DRPSAMF ¶ 67.[29]

## III. THE PARTIES' POSITIONS

Delta moves for summary judgment on all claims against it arguing that the claims: (1) are preempted by federal law, (2) are based on acts of independent contractors for whom Delta cannot be held vicariously liable, and (3) cannot support an award of punitive damages. *Def.'s Mot.* at 1.

### A. Preemption

#### 1. ADA Express Preemption

##### a. Delta's Position

Delta argues that the Airline Deregulation Act (ADA), 49 U.S.C. § 40101 *et seq.* expressly preempts the Halls' claims. *Id.* at 4-9. Specifically, it underscores the statute's preemption provision:

Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law

---

[29] Delta pointed out that the text of the e-mail submitted by the Halls contained some added emphasis and that it omitted these words from the last sentence of the excerpt: "with all involved and." DRPSAMF ¶ 67. The Court accepts the qualification, removes the emphasis, and adds the missing words.

related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1). Delta states that the First Circuit's ADA preemption analysis consists of two parts: the "mechanism" question and the "linkage" question. *Def.'s Mot.* at 5. The mechanism question pertains to whether the claims are state-law claims, and the linkage question asks whether and to what degree the claims are related to price, route, or service of air carriers. *Id.*

With respect to mechanism, Delta observes that the Halls' negligence and loss of consortium claims are brought under Maine or Georgia law. *Id.* at 6. With respect to linkage, Delta avers that the Halls' claims are sufficiently related to Delta's services to be preempted. *Id.* at 6. Delta asserts that the Supreme Court has repeatedly instructed that the "related to" language in the ADA's preemption provision must be read broadly. Delta states that the First Circuit has defined the term "service" as: "a 'bargained-for or anticipated provision of labor from one party to another,' thus leading to 'a concern with the contractual arrangement between the airline and the user of the service.'" *Id.* at 6 (citing *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014)). Delta cites a number of cases in which the Supreme Court and the First Circuit have held state law claims preempted by the ADA.

Delta acknowledges a "general rule" that personal injury claims are not preempted but argues that the rule should not be applied in this case for two reasons. *Def.'s Mot.* at 8. First, Delta points out that the First Circuit has counseled that ADA preemption analysis does not permit general rules concerning broad categories of claims. *Id.* (citing *Tobin*, 775 F.3d at 455). Second, Delta argues that because the

18

Halls' claims involves independent contractors, "[a]ny liability for Delta would require revisiting its rights and obligations concerning the use of independent contractors for boarding of disabled passengers." *Def.'s Mot.* at 9. It states that "[a] jury evaluating Delta's liability would [] be called upon to evaluate [] purported oversight activities by Delta employees over FSS and AirServ," and it asserts that the ADA preemption provision is designed to avoid such a situation. *Id.* Delta argues that the Halls' claims constitute "a frontal assault on air carrier policies for rendering services in compliance with the ACAA." *Def.'s Reply* at 3. It asserts that the Halls' claims are sufficiently linked to airline industry services because "[a]llowing [the] claim[s] to proceed would impose an additional burden on air carriers, requiring them to rethink their policies for the boarding and deplaning of disabled passengers perhaps concluding that they need to hire and train additional in-house personnel to perform such services." *Id.*

### b. The Halls' Position

As "[a] threshold point relevant to the preemption analysis," the Halls clarify that their theory of Delta's liability is that the services rendered by its servants to Mr. Hall were rendered negligently—not that the training and/or boarding or deplaning procedures were inadequate or negligently designed, or that Delta's choice of FSS and/or AirServ as mobility contractors was negligent. *Pls.' Opp'n* at 3; *see also id.* at 9 n.5.

The Halls argue that the ADA does not expressly preempt their claims, saying the claims would not have a forbidden significant effect on airline operations because

19

the claims are "entirely too tenuous, remote and peripheral to the services Delta provides to passengers." *Id*. at 4. The Halls observe that Delta does not cite a single case in which a court found that the ADA preempted a state law tort cause of action. *Pls.' Opp'n* at 2-3.

Applying the First Circuit's two-step "mechanism" and "linkage" analysis, the Halls concede that their claims satisfy the "mechanism" prong. *Id*. However, they disagree with Delta's argument that their claims also satisfy the second prong because "there is no material linkage between these garden-variety personal injury claims and airline services that would warrant invocation of ADA preemption." *Id*. at 4-5 (footnote omitted). They assert that any linkage is "too tenuous, remote or peripheral" to be preempted. *Id*. at 4 (quoting *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 454-55 (1st Cir. 2014) (quoting *Morales*, 504. U.S. at 390)).

In support of the proposition that their claims do not have any material linkage to airline services as contemplated by the ADA preemption provision, the Halls point to the fact that another part of the statute requires that airlines maintain appropriate bodily injury insurance. *Id*. at 5. They suggest that if Congress had intended the preemption provision to cover personal injury claims then it would be illogical and incongruous to also require that the carriers maintain insurance for such occurrences. Citing caselaw, the Halls also argue that personal injury actions such as theirs do not give rise to the type of patchwork state regulations that the ADA was designed to avoid. *Id*. at 5-6.

The Halls highlight *Gill v. JetBlue Airways Corp.*, 836 F. Supp. 2d 33 (D. Mass. 2011), a case in which an incomplete quadriplegic sued an airline for negligence and negligent supervision after he fell out of an aisle chair while airline employees were assisting him with boarding one of its planes. *Pls.' Opp'n* at 6-8 (citing *Gill*, 836 F. Supp. 2d at 36-37). The District of Massachusetts found the ADA preemption clause "inapplicable to plaintiffs' claims because state law concerning negligence is not sufficiently 'related to' the particular services at issue." *Gill*, 836 F. Supp. 2d at 43.

The Halls also call the Court's attention to *Bower v. EgyptAir Airlines Co.*, 731 F.3d 85 (1st Cir. 2013), a First Circuit case that arose in the context of an international parental kidnapping. A father brought the action against an airline on his own behalf and as guardian of his two minor children, alleging various torts for allowing the mother (the father's ex-wife) to fly with their children to Egypt, in violation of custody order. *Id.* at 88-89, 93. The plaintiff's theory of liability was that the airline had missed a number of "red flags" indicating that a child abduction was in progress during the ticket purchase and check-in processes. *Id.* at 93-94. The First Circuit noted "that personal injury claims are generally not preempted by the ADA, [but that] there are numerous distinctions between personal injury claims and the claims present in this case." *Id.* at 95. The *Bower* Court held the ADA preempted the plaintiff's claims because they sufficiently related to the service of an air carrier. *Id.* at 98.

The Halls state that "the fact pattern in *Gill* is essentially identical to that here" and that this Court should come to the same conclusion as the *Gill* Court: that

the claims are insufficiently closely linked to the operations of the airline industry to be preempted by the ADA. *Pls.' Opp'n* at 10-11.

## 2. ACAA Implied Field Preemption

### a. Delta's Position

Delta also argues that the Air Carrier Access Act (ACAA), 49 U.S.C. § 41705 *et seq.* impliedly preempts their claims. *Def.'s Mot.* at 10-13. It acknowledges that the First Circuit has not decided an ACAA preemption case, and points to cases from other circuits. *Id.* at 10-11.

Delta posits that the implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field. *Id.* at 11. With respect to the first part, Delta defines the relevant regulatory field for the Halls' claims as the obligations of air carriers who engage independent contractors for boarding disabled passengers. *Id.* With regard to the second part, Delta concludes that the Department of Transportation, through the authority granted by the ACAA, has pervasively and specifically regulated that field. *Id.*

In arriving at that conclusion, Delta emphasizes that ACAA regulations impose oversight obligations on air carriers who engage independent contractors to perform boarding services. *Id.* For example, it cites Part 382 regulations that

> require that air carriers include assurances of compliance in their contracts with any independent contractors; provide training to any contractors' employees who will be interacting with passengers; conduct any such training within specific timeframes; include procedures implementing the requirements of Part 382 in any manuals, guidance,

or instructional materials provided to contractors; and retain training records for contractors for three years.

*Id*. at 11-12 (citing 14 C.F.R. §§ 382.15(b), 382.141(a)(6), 382.143(a), 382.145). According to Delta, these regulations preempt state law claims that "purport to cover, and as such, re-regulate, this same territory." *Id*. at 12.

### b.     The Halls' Position

The Halls argue that the ACAA does not impliedly preempt their claims because, to the extent the statute occupies a field, that field is discrimination against disabled passengers, and the Halls' claims fall outside that scope. *Pls.' Opp'n* at 14-15.  As a corollary, the Halls argue that even though Delta cites ACAA regulations as preempting the field, the regulations do not direct Delta or its contractors as to how to provide services to disabled passengers. *Pls.' Opp'n* at 14.  The Halls allege that the way Mr. Hall was provided services (negligently) was improper, and do not allege that he was discriminated against because of his disability. *Pls.' Opp'n* at 15.

The Halls cite caselaw supporting their argument, including *Hodges v. Delta Air Lines, Inc.*, No. C09–1547–BAT, 2010 WL 5463832 (W.D. Wash. 2010). *Pls.' Opp'n* at 12-13.  There, the plaintiff was an elderly right-leg amputee who required mobility services when disembarking a Delta plane. *Hodges*, 2010 WL 5463832, at *1.  While two AirServ employees were pushing her in a wheelchair down the aisle of the plane, she fell out of the wheelchair. *Id*.  The *Hodges* Court rejected Delta's argument that the ACAA preempted the plaintiff's negligence claims, holding that, while federal regulations may have occupied the field as far as ensuring disabled passengers are not discriminated against, they are silent as to how services should be provided to

those passengers. *Id*. at *4 (quoting *Elassad v. Independence Air, Inc.*, 613 F.3d 119, 131 (3rd Cir. 2010)).

The Halls point again to *Gill*, which also involved a claim by a defendant airline that the ACAA impliedly preempted a plaintiff's state-law negligence claims. *Pls.' Opp'n* at 14 (citing *Gill*, 836 F. Supp. 2d at 43-45). The *Gill* Court distinguished between failure to provide services—i.e., treating disabled passengers differently from able-bodied passengers—and negligently providing services to disabled passengers:

> JetBlue relies on the line of cases holding that claims premised on the *failure* to provide accommodations are preempted by ACAA regulations requiring airlines to provide such assistance when it is requested. This reliance is misplaced. As other courts have concluded, claims for failure to assist are distinguishable from those, such as plaintiffs' claim here, alleging *negligent provision* of assistance.

*Id*. at 45–46 (emphasis in original) (internal citation omitted).

### B.    Vicarious Liability

#### 1.    Delta's Position

As a threshold matter, Delta asserts that "there are compelling reasons to apply Maine law to both [the 2015 and 2016] incidents." *Def.'s Mot.* at 13 n.3. At the same time, Delta asserts that under either Maine or Georgia law, it is not vicariously liable for the actions of FSS and AirServ personnel.     *Id*. at 13-15. Delta observes that the general rule under the law of both states is that an employer may not be held liable for the acts of independent contractors. Because FSS and AirServ were independent contractors, Delta argues that it cannot be held liable for the actions and

inactions of FSS and AirServ personnel that make up the basis of the Halls' claims. *Id.* at 14.

Delta denies exerting significant control over FSS and AirServ employees. In doing so, it points to the facts that (1) the relevant personnel wore uniforms that identified them as either FSS or AirServ employees; (2) under the terms of their contracts with Delta, FSS and AirServ were required to ensure adequate supervisory and management presence for all requested services; and (3) under the terms of their contracts with Delta, FSS and AirServ were required to ensure that supervisory personnel were familiar with all aspects of special services, including providing training related to 14 C.F.R. Part 382. *Id.* at 14-15. Delta also asserts that it did not control the physical conduct of the FSS or AirServ personnel in the performance of their boarding and deplaning duties. *Def.'s Reply* at 7. It elaborates, "Delta did not direct or control, nor did it have any right to direct or control, the acts of FSS and AirServ employees in transporting Mr. Hall on and off the aircraft, strapping him in the aisle chair or transferring him from the aisle chair into an aircraft seat." *Id.*

Delta rejects the Halls' proposition that it had a non-delegable duty to the Halls. *Def.'s Reply* at 4-5. Citing 14 C.F.R. § 382.15, Delta argues that federal law expressly allows air carriers to delegate to independent contractors "their processes for providing reasonable accommodations." *Id.*

### 2. The Halls' Position

With respect to the choice of law issue, the Halls seem to believe Maine law should apply to the 2015 incident, and Georgia law to the 2016 incident. *See Pls'*

*Opp'n* at 17, 17 n.12.  The Halls dispute Delta's claim that it cannot be held vicariously liable for the actions of the FSS and AirServ personnel involved in the 2015 and 2016 incidents.  *Pls.' Opp'n* at 15-24.  One primary basis for the Halls' position is their contention that as a common carrier, Delta had a non-delegable duty of care to the Halls.  In support, the Halls cite caselaw from Georgia and Maine and a Georgia statute.  *Id.* at 15-19.

The Georgia statute states that "[a] carrier of passengers must exercise extraordinary diligence to protect the lives and persons of his passengers but is not liable for injuries to them after having used such diligence."  GA. CODE ANN. § 46-9-132 (West 2018).  They point to *Lane v. Montgomery Elevator Co.*, 484 S.E.2d 249 (1997), a case in which the Court of Appeals of Georgia rejected an elevator company's defense that a building owner had sole liability for an injury resulting from a malfunctioning elevator that the elevator company was contractually obligated to maintain.  *Lane*, 484 S.E.2d at 251.  The *Lane* Court stated that "[a] building owner, here presumably the corporation owning the [building], owes a duty of extraordinary diligence to elevator passengers and cannot delegate this duty to an independent contractor engaged to repair the elevator."  *Id.*  The Georgia Court of Appeals continued, "[u]nder OCGA § 51–2–5(4), an employer is liable for the negligence of an independent contractor who is performing the employer's nondelegable statutory duty."  *Id.*  The Halls reason that because § 46-9-132 places a duty of extraordinary diligence on Delta to protect the persons of its passengers, such as Mr. Hall, it may not delegate that duty to AirServ.  *Pls.' Opp'n* at 15-17.

With respect to their non-delegable duty argument and Maine law, the Halls quote *Mastriano v. Blyer*, 2001 ME 134, 779 A.2d 951 (2001) for the proposition that "[a] common carrier owes its passengers a duty that requires the exercise of the highest degree of care compatible with the practical operation of the machine in which the conveyance was undertaken." *Mastriano*, 2001 ME 134, ¶ 13, 779 A.2d 951. They say that such a duty is non-delegable, citing *State v. Torrey*, 148 Me. 107, 113, 90 A.2d 456, 459 (1952). They also cite the Restatement (Second) of Torts:

> An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.

Restatement (Second) of Torts § 428.

Aside from their non-delegable duty argument, the Halls argue that Delta is vicariously liable for FSS and AirServ's actions with respect to the 2015 and 2016 incidents because "Delta exercised pervasive control over the time, place and manner of the passenger assistance services provided by FSS and AirServ to Mr. Hall." *Pls.' Opp'n* at 2, 19. Citing caselaw, they assert that "[b]oth Maine and Georgia law hold that when a principal exercises material control over how the servant renders services, then the principal is liable for the servant's tortious act." *Pls.' Opp'n* at 19. They posit that control of the time, place, and manner of the work of the personnel is the key factor that the courts of both states consider.

They cite *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992), in which the Maine Supreme Judicial Court reversed a judgment against a landowner who was sued by

an abutter after a forester the landowner hired to log his land improperly cut a road on the abutter's property. *Bonk*, 605 A.2d at 76-77. The Law Court held that the landowner could not be held vicariously liable for the forester's trespass because the landowner "did not exercise control over [the forester] in the construction of the road," instead indicating only generally where the road could go, but otherwise leaving the forester to his own devices. *Id.* at 79. In doing so, the Law Court cited the Restatement (Second) of Agency (1958), § 2(2): "A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." *Id.* at 78.

The Halls put forward *Yancey v. Watkins*, 708 S.E.2d 539 (Ga. Ct. App. 2001) as counterexample to Delta's relationship with and control over FSS and AirServ. In *Yancey*, the plaintiff brought suit against his neighbor for damages incurred when a pilot hired by the neighbor to crop dust his fields, accidently caused chemicals to drift onto the plaintiff's land. *Id.*, 708 S.E.2d at 541. The Georgia Court of Appeals held that the neighbor could not be held liable for the negligence of his hired pilot because the former exercised almost no control over how the pilot did his work. *Id.* at 543.

Applying this standard to the facts here, the Halls conclude that Delta exercised control over how and when FSS and AirServ provided services to disabled passengers. In arriving at that conclusion, they cite provisions of the FSS and AirServ contracts, as well as the fact that FSS and AirServ personnel may not enter a plane to assist disabled passengers until Delta crew allow them to do so. *Pls.' Opp'n* at 20-21. The Halls also state that Delta flight crews have oversight as to how FSS

and AirServ provided passenger mobility services to Mr. Hall. They point to FAA regulations regarding flight crew control as well as the fact that Delta personnel stepped in during the 2016 incident, after Mr. Hall fell, to assist him and to radio ahead to Portland to request that two male FSS employees be available to assist him with deplaning. *Pls.' Opp'n* at 21. The Halls also underscore Delta's oversight and approval of the training of FSS and AirServ personnel, as well as its review and adjustment of FSS and AirServ staffing plans for mobility services. *Id.* at 22. They state that Delta "controlled when the services were provided and its own employees had the responsibility to step in if they saw a problem with how disabled passengers were being treated by the contractors, something they did during [] and after both incidents." *Id.* at 22.

## C.     Punitive Damages

In its motion, Delta argues that the Halls cannot seek punitive damages because the conduct leading to Mr. Hall's injuries was purely accidental. *Def.'s Mot.* at 15-16. It argues that under Maine law, malice is required for the award of punitive damages in a tort action. *Id.* (citing *Tuttle v. Raymond*, 494 A.2d 1353, 1363-64 (Me. 1985)). Delta cites a Georgia statute that reads, in part: "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b).

The Halls do not respond to this argument in their opposition.

## IV.    DISCUSSION

### A.    Preemption

Article VI, clause 2 of the Constitution of the United States reads in part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and all the Judges in every State shall be bound thereby, any Thing in the Constitution or Law of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. Known as the Supremacy Clause, the language expresses a principle simple in the abstract yet often difficult in application. Courts have used the rubric, the preemption doctrine, to refer to jurisprudence that interprets and applies the Supremacy Clause. Under preemption doctrine, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks Int'l Ass'n, Local 1625, AFL–CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963). "Congress may indicate pre-emptive intent through a statute's express language" or Congress can imply a statute's preemptive intent "through its structure and purpose." *Altria Grp. Inc. v. Good*, 555 U.S. 70, 76 (2008). "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id*. at 76. The Supreme Court instructs that Congress's preemptive intent is implied when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or when the state law intrudes into a field where "the scheme of federal regulation may be so pervasive as to make

reasonable the inference that Congress left no room for the States to supplement it."

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

### 1.    ADA Express Preemption

The "ADA was enacted in 1978 'as part of a wave of deregulatory measures'

aimed at lowering prices through competitive markets." *Venegas v. Glob. Aircraft*

*Serv., Inc.*, No. 2:14-cv-249-NT, 2016 WL 5349723, at * 10 (D. Me. Sept. 23, 2016)

(quoting *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 85 (1st Cir. 2011)).   Congress

included an express preemption provision in the ADA to ensure that "the new regime

was not trammeled by state re-regulation." *Id.* (quoting *DiFiore*, 646 F.3d at 85).   The

provision reads:

> Except as provided in this subsection, a State, political subdivision of a
> State, or political authority of at least 2 States may not enact or enforce
> a law, regulation, or other provision having the force and effect of law
> related to a price, route, or service of an air carrier that may provide air
> transportation under this subpart.

49 U.S.C. § 41713(b)(1).   Delta argues that this expressly preempts the Halls' claims.

*Id.* at 4-9.   The Court disagrees.

The Supreme Court has held that the ADA preemption provision should be

broadly read. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-384.   However,

"[t]his is not to say that Congress intended all common law tort and contract claims

to be preempted by the ADA.   To the contrary, the Supreme Court has clearly stated

that there are numerous claims that survive preemption." *Bower v. EgyptAir Airlines*

*Co.*, 731 F.3d 85, 93 (1st Cir. 2013) (citing *Morales*, 504 U.S. at 390).   Even if a state

law claim has some "connection with, or reference to" an airline's prices, routes, or

services that would bring it within the scope of the ADA, it will nevertheless not be preempted unless it has a "forbidden significant effect" on the same by interfering with the operation of the deregulated airline industry. *Morales*, 504 U.S. at 388. In other words, "[i]f the connection to an airline's prices, route, and services is 'too tenuous, remote, or peripheral,'" ADA preemption will not attach. *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 454-55 (1st Cir. 2014) (quoting *Morales*, 504. U.S. at 390). The First Circuit expressed the view that the provision that mandates liability insurance coverage for air carriers "would not make sense unless Congress intended certain tort claims to survive preemption." *Bower*, 731 F.3d at 93 (citing 49 U.S.C. § 41112(a) (requiring coverage "for bodily injury to, or death of, an individual . . . resulting from the operation or maintenance of the aircraft")).[30]

The First Circuit distills ADA preemption analysis into two parts: the "mechanism" question and the "linkage" question. *Bower*, 731 F.3d at 93. The mechanism question asks "whether the claim is based on a state 'law, regulation, or other provision having the force and effect of law.'" *Id.* (quoting *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013)). The linkage question asks "whether the claim is sufficiently 'related to a price, route, or service of an air carrier.'" *Id.* (quoting *Brown*, 720 F.3d at 63). The Halls concede that their claims meet the "mechanism" prong, and Delta does not assert a "linkage" to air carrier prices or routes. Hence, only the Halls' claims' "linkage" to air carrier service is at issue.

---

[30] Delta disputes that the mandatory insurance regulation under 49 U.S.C. § 41112(a) speaks to insurance to cover incidents such as the 2015 and 2016 incidents. *Def.'s Reply* at 1-2. The Court does not address this issue because, even if true, Delta's assertion would not alter the Court's analysis or conclusion.

### a.    *Gill v. JetBlue Airways Corp.*

In *Gill v. JetBlue Airways Corp.*, 836 F. Supp. 2d 33 (D. Mass. 2011), an incomplete quadriplegic sued an airline for negligence and negligent supervision after he fell out of an aisle chair while airline employees were assisting him with boarding one of its planes. *Id.* at 36-37. The District of Massachusetts found the ADA preemption clause "inapplicable to plaintiffs' claims because state law concerning negligence is not sufficiently 'related to' the particular services at issue." *Id.* at 43. It cited support in the caselaw for its view. "[I]n cases involving personal injury, courts have generally held that negligence claims were not preempted by the ADA on the grounds that the enforcement of tort remedies is not sufficiently "related to" airline services . . . ." *Id.* at 42. The *Gill* Court found that, even if the claims were "related to" air carrier service, the claims were nonetheless "too tenuous, remote, or peripheral" to warrant preemption. *Id.*, at 41, 43. The district court reasoned that the negligence claims were not preempted because they did not have the "forbidden significant effect" on JetBlue or the industry that *Morales* warned against:

> A general rule against ADA preemption of personal injury claims sounding in negligence is also consistent with the policy and structure of the statute as a whole. The ADA deregulated aspects of the airline industry previously subject to federal regulation. The statute's preemption clause aimed "to ensure that the states would not *re*-regulate what Congress had decided to *de*[-]regulate." [*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 191 (3d Cir. 1998)]. There is little reason to believe that the clause was intended to extend to personal injury actions, which were not the subject of federal regulation in the first place. The ADA's policy of "maximum reliance on competitive market forces" to further "efficiency, innovation, and low prices," *Morales*, 504 U.S. at 378, would not logically require a preemptive effect on claims "based on negligence and the standard of reasonable care [that do] not purport to regulate the services that air

carriers provide to their customers in exchange for their fares[.]" [*Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 321 (E.D. Mich. 1993)] . . . .

Plaintiffs allege that JetBlue employees breached a standard of care imposed on society as a whole (or, at least, one imposed on all common carriers). The enforcement of this standard may have incidental impacts on the nature of boarding services provided to disabled passengers by airlines, but there is no reason to believe it will restrain the ability of airlines to compete in providing those services.

*Id*. at 42-43 (certain internal citations omitted).

### b. *Bower v. EgyptAir Airlines Co.*

*Bower v. EgyptAir Airlines Co.*, 731 F.3d 85 (1st Cir. 2013), is a First Circuit case that arose in the context of an international parental kidnapping. A father brought the action against EgyptAir on his own behalf and as guardian of his two minor children, alleging interference with his custodial relations, negligence, negligent infliction of emotional distress, and loss of filial consortium for allowing the mother (the father's ex-wife) to fly with their children to Egypt, in violation of a custody order. *Bower*, 731 F.3d at 88-89, 93. The plaintiff's theory of liability was that the airline had missed a number of "red flags" indicating that a child abduction was in progress, including (1) the differing surnames of the mother and children, (2) that the mother bought same-day one-way tickets from New York City to Cairo in cash, (3) that Egypt is not a signatory to the Hague Convention, and (4) that the children's Egyptian passports lacked United States entry visas. *Id*. at 93-94.

The *Bower* Court determined that the plaintiff's claims "challenge[d] airline ticketing, check-in, and boarding procedures [and, thus] sufficiently relate[d] to the service of an air carrier." *Id*. at 98. Thus, the First Circuit commented that the

plaintiff's claims would "impos[e] a fundamentally new set of obligations on airlines under the rubric of 'duty of care,'" including "heightened and qualitatively different procedures for the booking and boarding of certain passengers on certain flights." *Id.* at 96. Because the claims, unlike personal injury causes of action, would cause this type of "forbidden significant effect" on EgpytAir and the airline industry in general, the First Circuit ruled that the ADA preempted the plaintiff's claims. *Id.* at 97-98.

Contrasting the plaintiff's claims on one hand and personal injury claims on the other, the First Circuit stated that "[t]he ADA offers little reason to treat a passenger who slips and falls while deplaning differently than one who slips and falls in a restaurant." *Id.* at 96. It reasoned that this is because:

> [T]ort claims like the one at issue in *Gill* [do not] gives rise to the type of patchwork state regulations that the ADA was intended to dissolve. Much like the laws against gambling and prostitution referenced as "tenuous" in *Morales*, standard common law duties of care have little effect on an airlines' day-to-day operations. *See Morales*, 504 U.S. at 390.

*Id.* The First Circuit noted "that personal injury claims are generally not preempted by the ADA, [but that] there are numerous distinctions between personal injury claims and the claims present in this case." *Id.* at 95.

### c. Any Effect of the Hall's Claims on Air Carrier Service Is Too Tenuous, Remote, or Peripheral to be Preempted

The Halls' claims are, as they themselves state, garden-variety personal injury claims, the likes of which courts nationwide adjudicate daily. As the First Circuit has characterized the state of the caselaw, "nearly all courts agree [that personal injury tort claims] are not preempted by the ADA." *Bower*, 731 F.3d at 95; *see also Jiminez-*

*Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344, 348-49 (D.P.R. 2011) (collecting cases that hold state personal injury causes of action not preempted by the ADA); *Kelley v. United Airlines, Inc.*, 986 F. Supp. 684, 685 (D. Mass. 1997) (also collecting cases holding claims not preempted). This is largely because "[t]he ADA amendments to the [Federal Aviation Act] simply evince no intent, either express or implied, on the part of Congress to preempt traditional state law claims for negligence." *Dudley v. Bus. Express, Inc.*, 882 F. Supp. 199, 207 (D.N.H. 1994).

The Halls' claims do not challenge processes or procedures or the way services are delivered. They simply complain about how services were delivered during the 2015 and 2016 incidents—namely, negligently. They do not seek to upend the practices of Delta or the airline industry as a whole. Rather they seek compensation for the harm inflicted upon them. Hence, any effect of their claims on air carrier service would be far too "tenuous, remote, or peripheral" to make them subject to the preemption provision of the ADA. *See Morales*, 504 U.S. at 390.

Delta's contrary assertion is unpersuasive. It claims—without explanation—that the Halls' claims would require the industry as a whole to rethink policies and hire and train new personnel. The Court disagrees. Sufficient personnel were in place for the 2015 and 2016 incidents. Undoubtedly any policies and training in place currently or in the future—irrespective of the Halls' claims—must instruct those personnel not to negligently drop a passenger or allow a passenger to fall out of an aisle chair. Not only would the Halls' claims not have the "forbidden significant effect" on the airline industry, *Morales*, 504 U.S. at 388, Delta has not explained why

the Halls' claims would cause any change within Delta. Concurring with the weight of authority, the Court concludes that the ADA does not expressly preempt the Halls' claims.

## 2. ACAA Implied Field Preemption

Delta argues that the Air Carriers Access Act (ACAA) impliedly preempts the Halls' claims. *Def.'s Mot.* at 10-13. The ACAA is an amendment to the Federal Aviation Act enacted in 1986 to address and prohibit discrimination in air travel on the basis of disability. *Elassad v. Independence Air, Inc.*, 613 F.3d 119, 131 (3rd Cir. 2010); *Gill*, 836 F. Supp. 2d at 43. Under the ACAA, "[i]n providing air transportation, an air carrier . . . may not discriminate against an otherwise qualified individual" on the ground that "the individual has a physical or mental impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705(a)(1). The ACAA authorizes the Secretary of Transportation to promulgate implementing regulations. *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 52 (D.C. Cir. 2016). These regulations, found at 14 C.F.R. Part 382, provide detailed requirements air carriers must follow in providing services to disabled passengers.

Field preemption applies "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cippolone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982)). Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field. *Nat'l Fed'n of the*

*Blind*, 813 F.3d at 734; *see also Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) ("[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."); *Oullette v. Mills*, 91 F. Supp. 3d 1, 8-10 (D. Me. 2015).

### a.    Caselaw

In *Elassaad v. Independence Air, Inc.*, 613 F.3d 119 (3rd Cir. 2010), the Third Circuit addressed the precise question before the Court here. There, a right-leg amputee fell and suffered injury while disembarking a plane operated by the defendant airline under the auspices of Delta. *Elassaad*, 613 F.3d at 122. The defendant argued that the ACAA impliedly preempted the plaintiff's negligence claim. *Id.* at 131. The Third Circuit rejected the argument, finding that the statute is focused on nondiscrimination, respect, and dignity for airline passengers with disabilities and that such a focus does not implicate negligence actions. *Id.* at 131-33.

In *Hodges v. Delta Air Lines, Inc.*, No. C09–1547–BAT, 2010 WL 5463832 (W.D. Wash. Dec. 29, 2010), the plaintiff was an elderly right-leg amputee who required mobility services when deplaning a Delta plane. *Hodges*, 2010 WL 5463832, at *1. Two AirServ employees boarded to assist her in deplaning by transferring her from her seat into a wheelchair. *Id.* Following the transfer, she fell from the wheelchair while it was being pushed down the aisle, and she brought a negligence action. *Id.* The district court rejected Delta's argument that the ACAA preempted the negligence claim, holding that, while federal regulations may have occupied the

field as far as ensuring disabled passengers are not discriminated against, they are silent as to how services should be provided to those passengers:

> While the ACAA contains pervasive regulations, these regulations target the interaction between airlines and disabled passengers, "ensuring that services, facilities, and other accommodations are provided to passengers in a respectful and helpful manner." [*Elassaad*, 613 F.3d at 131.] These regulations do not however, appear to pervasively regulate the incident that occurred here. The ACAA regulations say nothing about how to move a disabled passenger from a plane seat to a wheelchair, how many people must assist the passenger, whether the passenger must be buckled in to the wheelchair, and the like. *See* 14 C.F.R. § 382.1 *et seq.* Because the regulations leave such issues open, federal law cannot possible preempt all state tort claims in this case.

*Id*. at *4. Other courts have come to the same conclusion. *See e.g., Gilstrap v. United Air Lines*, 709 F.3d 995, 1006-07 (9th Cir. 2013); *Adler v. WestJet Airlines, Ltd.*, 31 F.Supp.3d 1381, 1386 (S.D. Fla. 2014) ("The Court thus determines that because the Adlers' state-law negligence claim is not a claim for disability discrimination, and instead rests upon personal injuries allegedly suffered as a result of WestJet's failure of care, WestJet has not demonstrated that the claim is preempted by the 13 ACAA"); *Gill*, 836 F. Supp. 2d at 46 n.5 ("ACAA preemption does not extend to negligence claims premised on the negligent performance of boarding-assistance duties").

### b. ACAA Does Not Impliedly Preempt the Halls' Claims

The ACAA and its implementing regulations focus on discrimination against disabled passengers. So to the extent that the ACAA *might* field preempt any state-law claims, those would be discrimination claims against disabled airline passengers. The ACAA and its regulations say nothing about how to move a disabled passenger to and from a plane seat to a wheelchair, how many people must assist the passenger,

whether the passenger must be buckled in to the wheelchair, and the like. *See* 14 C.F.R. §§ 382.1 *et seq.* Because the regulations leave such issues open, the ACAA does not preempt state tort claims in this area.

The Halls do not claim that Detla "violated any of its obligations under the ACAA, nor d[o they] even suggest that discrimination played any role in its conduct toward [Mr. Hall]." *Elassaad*, 613 F.3d at 132. Instead their claims are garden-variety personal injury claims alleging negligence that occupy a space outside the scope of the ACAA's regulatory arc. The Court concludes that the ACAA does not impliedly field preempt the Halls' claims.

### B. Vicarious Liability

#### 1. Conflict of Laws

The parties suggest that the case may present a conflict of laws issue, but they have not thoroughly briefed it.[31] *Def.'s Mot.* at 13 n.3; *Pls.' Opp'n* at 17 n.12. In deciding which state's substantive law applies, federal courts sitting in diversity follow the forum state's choice of law rules. *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Maine uses the "most significant contacts and relationships" test set out in the Restatement (Second) of Conflict of Laws. *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 934 (Me.

---

[31] Although there is a potential conflict of laws issue lurking, the Court is not convinced that the conflict, such as it is, makes a difference to the resolution of the pending motion. As the case progresses, the Court will likely require counsel, applying Maine choice of law principles, to address more extensively the potential for a conflict between Maine and Georgia law, whether the conflict matters for purposes of trial, and what substantive law instructions the Court should give the jury.

1982); *Collins v. Trius, Inc.*, 663 A.2d 570, 572 (Me. 1995).  Section 145 of the

Restatement articulates choice-of-law principles for tort cases:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts § 145 (1971).  Section 146 specifics a default rule

of applying the law of the place of injury in personal injury cases, with an exception:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*Id*. § 146.  Finally, Section 6, which is cross-referenced in Sections 145 and 146, sets

forth general choice-of-law principles:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>> (a) the needs of the interstate and international systems,
>> (b) the relevant policies of the forum,
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>> (d) the protection of justified expectations,

41

(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Id*. § 6.

These are the principles the Court would apply to resolving a conflict between Maine and Georgia law, if one existed. However, the Court is not convinced that Maine and Georgia law conflict for purposes of Delta's vicarious liability theory. The Court determines that—irrespective of whether Maine or Georgia law properly applies—the vicarious liability theory does not entitle Delta to summary judgment. *See Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) ("It is unnecessary that we make a formal choice of law since, whether Delaware or Massachusetts law is used, the result will not vary").

## 2. Non-Delegable Duty as Common Carrier

The Halls dispute Delta's claim that it cannot be held vicariously liable for the acts and omissions of FSS and AirServ, in part, because they argue that Delta owed Mr. Hall a non-delegable duty. "The duty of a common carrier of passengers to exercise the requisite degree of care for those it undertakes to transport upon its facilities is nondelegable; when a duty is nondelegable, liability still attaches to the principal even though the injuries are directly attributable to the negligence of an independent contractor." 14 AM. JUR. 2D *Carriers* § 809. A Part 382 regulation also suggests that Delta had a non-delegable duty to Mr. Hall. Titled "§ 382.15 Do carriers have to make sure that contractors comply with the requirements of this Part?," the regulation reads, in part:

42

(a) As a carrier, you must make sure that your contractors that provide services to the public (including airports where applicable) meet the requirements of this part that would apply to you if you provided the services yourself.

. . .

(d) You remain responsible for your contractors' compliance with this part and for enforcing the assurances in your contracts with them.
(e) It is not a defense against an enforcement action by the Department under this part that your noncompliance resulted from action or inaction by a contractor.

14 C.F.R. § 382.15. Both Maine and Georgia law suggest support for the Halls' argument.

### a. Maine Law

In *Mastriano v. Blyer*, 2001 ME 134, ¶ 13, 779 A.2d 951 (2001) the Maine Supreme Judicial Court stated that "[a] common carrier owes its passengers a duty that requires the exercise of the highest degree of care compatible with the practical operation of the machine in which the conveyance was undertaken." *Id.*, 2001 ME 134, ¶ 13, 779 A.2d 951. In another case, the Law Court suggested that certain duties of common carriers are non-delegable. *State v. Torrey*, 148 Me. 107, 113, 90 A.2d 456, 459 (1952). In *Torrey*, the court considered the relationship and duties imposed among a truck owner, a common carrier, and an arguably independent truck driver in the context of a state prosecution for transporting freight and merchandise for hire without a required state permit. *Id.* at 107. While not central to the resolution of the case, the court noted that the common carrier, Hemingway, could not delegate its responsibilities to others:

The tort cases point to the liability of the lessee. In terms of the present case Hemingway could not delegate its responsibility to others. Those who carry goods for it, including the [truck driver], must be considered as a part of the Hemingway organization for the limited period of the lease.

*Id*. at 113. The Restatement (Second) of Torts supports this view:

An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.

Restatement (Second) of Torts § 428.

## b. Georgia Law

Georgia caselaw suggests that Delta had a non-delegable duty with respect to

Mr. Hall's safety.

The standard of care applicable to common carriers . . . provides that [a] common carrier of passengers is not an insurer of the safety of its passengers, but must exercise extraordinary diligence to protect the lives and persons of its passengers. Extraordinary diligence is defined as that extreme care and caution which very prudent and thoughtful persons exercise under the same or similar circumstances. This duty is non-delegable regardless of whether the common carrier contracts with a third party to perform the maintenance and repairs, and in such cases the common carrier remains liable for slight negligence.

*Sparks v. Metropolitan Atlanta Rapid Transit Authority*, 478 S.E.2d 923, 925

(Ga. Ct. App. 1996) (internal citations and quotation omitted).

A Georgia statute specifies when an employer is liable for the negligence of a

contractor:

An employer is liable for the negligence of a contractor:

(1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;

(2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed;

(3) If the wrongful act is the violation of a duty imposed by express contract upon the employer;

(4) If the wrongful act is the violation of a duty imposed by statute;

(5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or

(6) If the employer ratifies the unauthorized wrong of the independent contractor.

GA. CODE ANN. § 51-2-5 (West 2018).

"Pursuant to OCGA § 51-2-5(4), an employer is liable for the negligence of an independent contractor who is performing the employer's nondelegable statutory duty." *Perry v. Soil Remediation, Inc.*, 471 S.E.2d 320, 322 (Ga. Ct. App. 1996). Thus, even if FSS and AirServ were independent contractors of Delta, under Georgia law, Delta likely had a duty to Mr. Hall that it could not have delegated to FSS or AirServ, thus opening it to liability for the incidents.

Since both Maine and Georgia law support the Halls' argument that Delta had a non-delegable duty with respect to Mr. Hall, Delta may not avoid legal responsibility solely because of FSS and AirServ personnel's arguable status as independent contractors. *See Lane v. Montgomery Elevator Co.*, 484 S.E.2d 249, 251 (Ga. Ct. App. 1997). However, the Court does not finally decide this issue because it is not necessary to resolve the motion.

### 3. The Status of FSS and AirServ Personnel: Servants versus Independent Contractors

#### a. Maine Law

"[T]he label used by the parties to characterize their relationship is not controlling." *Rainey v. Langen*, 2010 ME 56, ¶ 25, 998 A.2d 342 (citing *Campbell v. Wash. Cnty. Technical Coll.*, 219 F.3d 3, 7 (1st Cir. 2000) ("Maine courts follow the oft-stated rule that the legal relationship between the parties does not turn on the label the parties themselves attach")). Instead, the Maine Supreme Judicial Court has enumerated eight factors to be weighed in determining whether an independent contractor relationship exists, the most important of which is the "right to control":

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price;
> (2) independent nature of the business or his distinct calling;
> (3) his employment of assistants with the right to supervise their activities;
> (4) his obligation to furnish necessary tools, supplies, and materials;
> (5) his right to control the progress of the work except as to final results;
> (6) the time for which the workman is employed;
> (7) the method of payment, whether by time or by job;
> (8) whether the work is part of the regular business of the employer.

*Rainey*, 2010 ME 56, ¶ 15 n.4, 998 A.2d 342 (citing *Legassie v. Bangor Publ'g Co.*, 1999 ME 180, ¶¶ 6 n.1, 8–11, 741 A.2d 442 (applying the eight factor test originally set forth in *Murray's Case*, 130 Me. 181, 186, 154 A. 352, 354 (1931))).

The right to control "includes the rights both to employ and to discharge subordinates and the power to control and direct the details of the work." *Legassie*, 1999 ME 180, ¶ 6, 741 A.2d 442. On this point, the Law Court emphasized that the right to control the "details of the performance," which is indicative of an employer-employee relationship, "must be distinguished from the right to control the result to be obtained, usually found in independent contractor relationships." *Id*.

> (2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.
>
> (3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

*Bonk*, 605 A.2d at 78 (quoting Restatement (Second) of Agency (1958)).

"As a general rule, there is no vicarious [tort] liability upon the employer of an independent contractor" because of the lack of control by employer over the details of contractor's physical conduct. *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992) (internal citations omitted).

### b. Georgia Law

Georgia law also emphasizes control as a key determinant of whether an entity is an independent contractor. The Georgia Supreme Court stated that:

> The true test whether a person employed is a servant or an independent contractor is whether the employer, under the contract, whether oral or written, has the right to direct the time, the manner, the methods, and the means of the execution of the work, as contradistinguished from the right to insist upon the contractor producing results according to the contract, or whether the contractor in the performance of the work contracted for is free from any control by the employer of the time, manner, and method in the performance of the work.

*Withrow Timber Co., Inc. v. Blackburn*, 261 S.E.2d 361, 362 (Ga. 1979); *see also Wilann Props. I, LLC v. Georgia Power Co.*, 740 S.E.2d 386, 393 (Ga. Ct. App. 2013) (no vicarious liability where the contractor "was responsible for all means, methods, techniques and procedures associated with trimming trees and vegetation within the right-of-way").

In *Yancey*, the Court of Appeals of Georgia applied these principles, finding that a pilot applying chemicals to a farmer's fields of crops was an independent contractor. In doing so, the court reasoned:

> [The farmer] had a very limited role in actually directing or controlling [the pilot]'s crop dusting. [The farmer] hired [the pilot] on a one-time basis to apply the chemicals, but there is no evidence that [the farmer] controlled precisely when and how [the pilot] flew during the crop dusting. As explained in [the farmer]'s deposition, he informed [the pilot] that the chemicals were at the airport and asked [the pilot] to apply the chemicals "whenever he could get to it." [The farmer] asked [the pilot] to perform the defoliation based on the recommendation from a cotton scout that his crop was "ready," and [The farmer] believed there was "no push [for time]. If you do it today[,] okay. If you do it three days from now, it's okay."
>
> Furthermore, [the pilot] deposed that he operated his flying service as an independent business called Owensboro Ag Service, through which he performed work for a number of farmers. In the present case, [the pilot] explained that he himself decided when to apply the chemicals according to the weather and his other scheduled work. [The pilot] alone determined the method and manner of applying the chemicals, according to his past experience and current observations made on the day he flew. Based on this record, we conclude that [the pilot] was acting as an independent contractor.

*Yancey*, 708 S.E.2d at 543.

### c. Delta's Control Over the Time, Place, and Manner of FSS and AirServ's Provision of Mobility Services to Disabled Passengers

Delta controlled exactly when FSS and AirServ could provide mobility services, determining when their personnel could board planes to enplane or deplane passengers. FSS and AirServ were obligated to respond to Delta's midflight requests for service, such as when the pilot radioed ahead to Portland to request two male FSS mobility assistants for Mr. Hall following the 2016 incident. Moreover, Delta

determined the method and manner of how those services were provided, both before the 2015 and 2016 incidents by reviewing and approving FSS and AirServ training and staffing plans, and during those incidents by taking control of both situations.

There is ample uncontroverted evidence in the record to support the Halls' contention that Delta did control FSS and AirServ in their provision of mobility services for disabled passengers. Even though the degree of control is disputed, at this stage, the Court is required to view contested evidence in the light most favorable to the Halls. *See Yancey v. Watkins*, 708 S.E.2d 539, 543 (Ga. Ct. App. 2011) ("Although the relationship between an alleged master and servant is generally a question of fact to be decided by a jury, there are cases presenting factual situations wherein this issue has been decided as a matter of law"); *Mwangi v. Fed. Nat'l Mortg. Ass'n*, 162 F. Supp. 3d 1331, 1338-1339 (N.D. Ga. 2016) ("Whether an individual or company is an independent contractor generally is a question of fact") (citing *Slater v. Canal Wood Corp. of Augusta*, 345 S.E.2d 71, 72 (1986)); *Legassie v. Bangor Pub. Co.*, 1999 ME 180, ¶14, 741 A.2d 442 (material issues of fact as to whether carrier was an employee or independent contractor precluded summary judgment for publishing company on plaintiff's vicarious liability claim).

The Court concludes that the record reveals genuine issues of material fact relevant to whether, under Maine or Georgia law, Delta may be held vicariously liable for the acts of FSS and AirServ personnel relative to the 2015 incident and 2016 incident. Given this and support for the Halls' nondelegable duty argument, Delta's vicarious liability theory does not entitle it to summary judgment.

## C.      Punitive Damages

Neither Maine nor Georgia law permits an award of punitive damages for mere negligence without more.  *Tuttle v. Raymond*, 494 A.2d 1353, 1360-61, 1363-64 (Me. 1985); GA. CODE ANN. § 51-12-5.1(b) ("[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences"); *Ambling Mgmt. Co. v. Purdy*, 640 S.E.2d 620, 629-30 (Ga. Ct. App. 2006) (quoting *Colonial Pipeline Co. v. Brown*, 365 S.E.2d 827, 832 (Ga. 1988)); *Norris v. Bangor Pub. Co.*, 53 F. Supp. 2d 495, 507 (D. Me. 1999).

In their Complaint, the Halls state

> The totality of Delta's conduct was so egregious and such a gross deviation from the applicable standard of care that malice may be implied to justify an award of punitive damages.  Alternatively or additionally, the totality of Delta's conduct demonstrated an entire want of care raising the presumption of a conscious indifference to the consequences sufficient to justify an award of punitive damages.

*Compl.* ¶ 15.  Elsewhere in their filings they describe the incidents as "negligent accidents."  PRDSMF ¶ 48.  They also characterize their claims as "garden-variety."

Although the Court could hold that the Halls waived their right to contest Delta's motion for summary judgment on the punitive damages allegations by failing to respond this part of Delta's motion, the Court views the punitive damages claim as one that depends on contested facts, not on law, and therefore not susceptible to summary judgment.  Based on this record, the Court is skeptical about whether the Halls will be able to adduce sufficient evidence to maintain the punitive damages

50

claim at trial, nevertheless, as the Halls' claims involve the two remarkably similar incidents involving the same individual, that determination is better made at trial based on all the evidence, rather than in a dispositive motion, based on a truncated and static record.[32]

## V.    CONCLUSION

The Court DENIES the Defendant's Motion for Summary Judgment (ECF No. 42).

SO ORDERED.


<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2018

---

[32]    If this case proceeds to trial, the Court will likely bifurcate the punitive damages claim from the rest of the trial and will determine whether the Halls should be allowed to proceed with their punitive damages claim.